812 A.2d 1075

**Orlandus E. GIDDENS**

v.

**STATE of Maryland.**

**No. 636, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Dec. 20, 2002.

Geraldine K. Sweeney, Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Leigh S. Halstad, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Sandra A. O'Connor, State's Atty for Baltimore County, Towson, on the brief), for appellee.

Argued Before MURPHY, C.J., DAVIS and MARVIN H. SMITH (Ret'd, specially assigned), JJ.

MURPHY, Chief Judge.

In the Circuit Court for Baltimore County, a jury (Hon. J. Norris Byrnes, presiding) convicted Orlandus E. Giddens, appellant, of "depraved heart" second degree murder and child abuse. The conflicting evidence presented to the jury was sufficient to establish that appellant committed those offenses against his infant daughter, Sianii Giddens. Appellant argues that he is entitled to a new trial because

WHERE THE TIME OF INJURY WAS A CRUCIAL ELEMENT IN THE CIRCUMSTANTIAL EVIDENCE AGAINST APPELLANT, THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR NEW TRIAL BASED ON EVIDENCE THAT THE STATE'S EXPERT HAD RELIED ON A TEST FOR DETERMINING TIME OF INJURY THAT WAS NOT GENERALLY ACCEPTED AS RELIABLE BY THE SCIENTIFIC COMMUNITY.

We are persuaded that Judge Byrnes neither erred nor abused his discretion in denying appellant's motion for new trial. We shall therefore affirm the judgments of the circuit court.

## The "Time of Injury" Issue

The State presented evidence that appellant was the only adult present in the Giddens' household during the period of time in which the victim suffered the fatal injuries discovered during an autopsy performed on the day after the victim had been pronounced dead. The defense argued that the victim's

fatal injuries were inflicted by appellant's wife during a period of time that preceded the period of time during which appellant was in charge of the victim's care.

During the State's case-in-chief, Dr. Joseph Pestaner, the Assistant Medical Examiner who performed the autopsy, opined that the victim's head, neck, and spine injuries were inflicted upon her less than one hour before she died. According to Dr. Pestaner, he was able to narrow the time frame to a maximum of one hour because the autopsy revealed that there was "a lack of swelling" in the victim's spinal cord.

The defense called Dr. John E. Adams, a forensic pathologist, who reviewed the autopsy report. Dr. Adams opined that (1) the victim's head, neck, and spine injuries probably occurred within eight hours of her death, but (2) it was not more likely so than not so that those injuries occurred within an hour of her death. According to Dr. Adams, the lack of spinal cord swelling did not permit any conclusion other than the conclusion that the injuries were inflicted within eight hours of the victim's death.

The jury found appellant guilty and appellant moved for a new trial on the grounds that (1) the State never notified appellant's counsel that the "lack of swelling" noted during the autopsy was an essential component of the Medical Examiner's "window of time" opinion,[1] and (2) experts in the field of forensic pathology do not accept the proposition that lack of swelling in the central nervous system can be used to determine the period of time within which the deceased was injured.

### Testimony presented at the Hearing on Appellant's Motion for New Trial

The defense called Dr. Barbara Carrol Wolf, an expert in pathology, who testified as follows:

Q. [DEFENSE COUNSEL]: Now, Doctor do you know of any study in the field of forensic pathology which recognizes

---

1. No "discovery violation" has been asserted in this appeal.

the lack of edema in the central nervous system as a way to date or time an injury?

A.  [DR. WOLF]: No, I do not.

Q.  Now, are you aware of any publications or even articles that supports [sic] that one can look at the lack of edema at all in determining the age of an injury?

A.  Certainly not an injury of the central nervous system, no.

Q.  Central nervous system I'm focusing on.

A.  No.

Q.  Have you done any research to see whether there are articles or studies on this particular area?

A.  Yes, I consulted all of the standard textbooks on forensic pathology and pediatric pathology;  as well as I did a literature search to see if there were any articles to support that position and I found none.

\* \* \*

Q.  Do you have an opinion to a reasonable degree of medical certainty whether the absence of edema to the central nervous system is recognized in the field of forensic pathology as an indicator as to timing of injury to the central nervous system?

A.  Yes, I do.  It is my opinion to a reasonable degree of medical certainty that the absence of edema in such an injury is not accepted as being an indicator of the timing of the [in]jury.

Dr. Wolf also testified that, according to a standard text, PEDIATRIC PATHOLOGY, (1) a fatal injury may or may not cause brain swelling, and (2) when brain swelling does occur, it usually does so between four and fourteen hours after the injury occurs.

The State called Dr. Pestaner, who supplied three articles that he claimed supported his testimony that the absence of swelling in the central nervous system is accepted as a "marker" to determine the period of time within which the injury

was inflicted. The following transpired during Dr. Pestaner's cross-examination:

> Q. [DEFENSE COUNSEL]: Okay, Well, let me see if I can make it real clear. You would agree that none of the articles you provided to either [the prosecutor] or to me says that lack of edema can be used in determining the age of an injury?

> A. [DR. PESTANER]: I think it's inferred as far as the textbooks what we do.

Judge Byrnes denied appellant's motion for new trial and this appeal followed.

## Discussion

■ We must first decide whether the denial of appellant's motion for new trial is to be reviewed under a "standard of whether the denial was erroneous" or under an "abuse of discretion" standard.[2] Because all of the scientific literature discussed and introduced during the post-trial hearing was available to the experts before the trial began, we shall apply the "abuse of discretion" standard of review to appellant's argument, which is as follows:

> The jury was told that Dr. Pestaner used the lack of swelling as a marker to date time of injury and that Dr. Adams did not. . . . Thus, the information presented to the jury, was of a difference of opinion between two experts.

> By contrast, the testimony of Dr. Wolf on the motion for new trial, was that there was no scientific support for Dr. Pestaner's opinion on this critical issue.

> Maryland subscribes to the *Frye–Reed* test for evaluating the admissibility of expert testimony. *Frye v. United*

---

2. In *Merritt v. State*, 367 Md. 17, 785 A.2d 756 (2001), the Court of Appeals noted that, although most denials of motions for new trial are reviewed under the "abuse of discretion" standard, "when an alleged error is committed during the trial, when the losing party or that party's counsel, without fault, does not discover the alleged error during the trial, ... the denial of the new trial motion [will be reviewed] under a standard of whether the denial was erroneous." *Id.* at 31, 785 A.2d 756.

*States,* 293 F. 1013 (D.C.Cir.1923); *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978). That standard requires that a methodology must be "generally accepted as reliable within the expert's particular scientific field." *Reed,* 283 Md. at 384, 391 A.2d 364; *and see* Md. Rule 5–702. That standard was not met in this case.

We are persuaded that there are two reasons why appellant is not entitled to a new trial: (1) the availability of new expert testimony is not grounds for a new trial; and (2) the *Frye–Reed* test applies to the methodologies underlying expert testimony and does not operate to exclude debatable conclusions that are based upon generally acceptable scientific principles.

### New Expert Testimony

Although neither the Court of Appeals nor this Court has addressed the issue of whether a party is entitled to a new trial in order to present "a new and different expert opinion . . . [,] [t]he courts of review which have considered [this] issue . . . appear to be in agreement that . . . the availability of new expert testimony is not ground for a new trial." *Fofar v. Williamson County Airport Authority,* 125 Ill.App.3d 526, 80 Ill.Dec. 866, 466 N.E.2d 318, 320 (1984) (citations omitted). In *Ruger v. State,* 263 Ga. 548, 436 S.E.2d 485 (1993), the Supreme Court of Georgia rejected the contention that a murder defendant was entitled to a new trial in order to present an expert witness who would testify that the State had presented "scientifically unsound" evidence that a fingerprint made by appellant was discovered on a bloody plastic bag found near the murder scene. According to the *Ruger* Court:

A new trial on the basis of newly discovered evidence will not be granted if the only effect of the evidence will be to impeach the credit of a witness. . . . Appellant's newly discovered evidence was tendered to disprove the facts on which [the State's expert's] testimony was founded, i.e., to refute that the facts on which she relied did prove that such bloodprints could be successfully reproduced and identified. Accordingly, because appellant's evidence served only to

impeach [the State's expert's] testimony, the trial court did not err by denying appellant's motion for new trial. *Id.* at 488.

In *McBirney v. City of Tulsa,* 505 P.2d 1403 (Okla. Crim.App.1973), the Court of Criminal Appeals of Oklahoma affirmed the decision of the Tulsa Municipal Court to deny a new trial to a defendant who had been convicted of driving while under the influence of intoxicating liquor. During the trial of this case, the prosecution called an expert witness who, "[b]ased upon a hypothetical question propounded by the prosecutor which included the blood test results and the defendant's conduct at the scene of the accident, [opined that] the defendant was under the influence of intoxicants." *Id.* at 1405. During a hearing on the defendant's motion for new trial, the defense presented a qualified expert whose "testimony in substance was that, given the same hypothetical given to the [State's expert] . . ., coupled with the defendant's medical history . . ., [this expert] would be unable to form an opinion one way or the other that the defendant was or was not under the influence of intoxicants at the time mentioned." The *McBirney* Court stated:

> The third paragraph of the Syllabus in *Ward v. State,* Okl. Cr., 444 P.2d 255 (1968), recites:
>
>> A motion for new trial upon the ground of newly discovered evidence is not sufficient where it only tends to discredit or impeach the witness for the State and especially where it would not change the result of the trial.
>
> The ultimate purpose of having [the defense expert] testify would be to obtain his opinion that he would be unable to form an opinion of whether or not the defendant was intoxicated. This testimony would be diametrically opposed to the opinion of [the State's expert]. This evidence would be submitted for the purpose of discrediting the opinion of [the State's expert]. It, therefore, falls within the rule in *Ward, supra.*

*Id.* at 1405. We adopt the rule announced in each of the above cited cases and hold that, under the circumstances of the case

at bar, Judge Byrnes did not abuse his discretion in denying appellant's motion for new trial.

### *Frye–Reed* and the "Time of Injury" Opinions

We also hold that there is no merit in appellant's argument that Judge Byrnes was required to apply the *Frye–Reed* test to Dr. Pestaner's "time of injury" opinion. The *Frye–Reed* test applies to methodologies, not the conclusions drawn from applying the methodologies:

> *Frye* sets forth only a legal standard which governs the trial judge's determination of a threshold issue. Testimony based on a technique which is found to have gained "general acceptance in the scientific community" *may* be admitted into evidence, but only if a trial judge also determines in the exercise of his discretion, as he must in all other instances of expert testimony, that the proposed testimony will be helpful to the jury, that the expert is properly qualified, etc. Obviously, however, if a technique does not meet the *Frye* standard, a trial judge will have no occasion to reach these further issues.

*Reed v. State,* 283 Md. 374, 389, 391 A.2d 364 (1978).

In *Wilson v. State,* 370 Md. 191, 803 A.2d 1034 (2002), the Court of Appeals ordered a new trial for a defendant convicted of murdering his infant child to collect the proceeds of an insurance policy. At trial, the State's experts based their cause of death opinions on the calculated likelihood that two Sudden Infant Death Syndrome (SIDS) fatalities in the same family is less than one percent. The Court of Appeals reversed, holding

> that the trial court erred in admitting expert testimony based on the product rule [which calculates the probability of the joint occurrence of a number of mutually independent events by multiplying the individual probabilities that each event will occur] because a condition necessary to the proper application of the product rule was lacking: there was inadequate proof of the independence of [the two children's] deaths.

* * *

In sum, there was inadequate proof of the statistical independence of SIDS deaths within a single family. Therefore, based on the current state of medical opinion, the product rule should not be employed in calculating the likelihood of multiple SIDS deaths within a single family. *Id.* at 209–210, 803 A.2d 1034.

*Wilson* involved a fact-specific application of the *Frye–Reed* test, which is applicable to the "lack of swelling" finding in the case at bar. Under the *Frye–Reed* test, if it were not generally accepted by expert pathologists that a properly conducted autopsy will reveal a lack of swelling in the deceased's brain and spinal column, Judge Byrnes would have excluded (1) evidence that there was a lack of swelling, and (2) a "time of death" opinion based upon that evidence.

It is also well settled, however, that if the relevant scientific community is in general agreement that a properly conducted scientific test will produce an accurate result, the *Frye–Reed* test does not operate to exclude conflicting expert opinions based upon such a test. Because expert pathologists do agree that a properly conducted autopsy will reveal lack of swelling in the victim's brain and spinal cord, nothing in *Frye, Reed* or *Wilson* requires the exclusion of Dr. Pestaner's "time of injury" opinion based upon that autopsy finding.

Appellant argues that the case at bar is "analogous" to *Keene Corp., Inc. v. Hall,* 96 Md.App. 644, 626 A.2d 997 (1993), in which this Court held that the circuit court should have excluded an expert opinion based upon the results of a polarized light microscopy [PLM] test that had been used to detect asbestos fibers in human tissue. The relevant scientific community in *Hall* (1) agreed that the PLM test produced an accurate result when applied to building material, but (2) did not agree that this test produces an accurate result when applied to human tissue. Because the PLM test result was an essential component of the expert's opinion, the opinion at issue in *Hall* failed to satisfy the *Frye–Reed* test. *Id.* at 660, 626 A.2d 997. In the case at bar, however, because patholo-

gists do agree that a properly performed autopsy will reveal lack of swelling in the brain and in the spinal column, an opinion based upon that autopsy finding does not violate the *Frye–Reed* standard.

The Supreme Court of Kansas has drawn a similar distinction between the opinion at issue in the case at bar and the opinion at issue in *Hall.* In *Kuhn v. Sandoz Pharmaceuticals Corp.,* 270 Kan. 443, 14 P.3d 1170 (2000), while reversing a summary judgment entered on the ground that the opinions expressed by appellant's "causation" experts were not generally accepted by other experts in the relevant scientific community, the Supreme Court of Kansas noted:

> It is well-established that the *Frye* test is exclusively concerned with the methodologies underlying expert testimony, rather than the conclusions of that testimony. The very wording of *Frye* demonstrates that the focus is on the underlying scientific principles from which the conclusions are deduced:
>
>> "Just when a scientific principle or discovery crosses the line between experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."
>
> *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013, 1014 (D.C.Cir.1923).

\* \* \*

The logical corollary of the *Frye* test's focus on methodology rather than conclusions is that even unpopular conclusions are admissible so long as they are based upon generally accepted methodologies.

270 Kan. 443, 14 P.3d 1170, 1182–83. *See also Intalco Aluminum Corp. v. Department of Labor and Industries,* 66 Wash. App. 644, 833 P.2d 390, 399–400 (1992), *review denied,* 120 Wash.2d 1031, 847 P.2d 481 (1993).

In *Osburn v. Anchor Laboratories, Inc.,* 825 F.2d 908 (5th Cir.1987), *cert. denied,* 485 U.S. 1009, 108 S.Ct. 1476, 99 L.Ed.2d 705 (1988), the United States Court of Appeals for the Fifth Circuit rejected the argument that a causation opinion was inadmissible because it "has not been widely accepted in the medical field," explaining:

> An expert's opinion need not be generally accepted in the scientific community before it can be sufficiently reliable and probative to support a jury finding. . . . What is necessary is that the expert arrived at his causation opinion by relying upon *methods* that other experts in his field would reasonably rely upon in forming their own, possibly different opinions, about what caused the patient's disease. . . . Thus, medical expert opinion testimony that is controversial in its conclusions can support a jury finding of causation as long as the doctor's conclusory opinion is based upon well-founded methodologies.

*Id.* at 915.

For the reasons set forth in the above cited cases, even assuming that Dr. Pestaner's "time of injury" opinion was "controversial" and/or "unpopular," it was not inadmissible under the *Frye–Reed* test.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**